MILLEN v. POTTER.

1. SPECIFIC PERFORMANCE—EVIDENCE—CONTRACTS—CORPORATIONS.
   Upon a review of the testimony in a stockholders' suit against a reorganized corporation and its promoters to compel defendants to perform an agreement for the issuance of stock in the new company, *held*, that the parties entered into a contract in manner and upon terms as claimed by the complainant and that they were entitled to have strict performance in equity.

2. SAME—GIFT.
   *Held*, further, that the agreement was not one to make a gift.

3. SAME—STATUTE OF FRAUDS—STOCK AND STOCKHOLDERS.
   The contract was not invalid under the statute of frauds, since it did not involve a sale of the stock, but merely the right of complainants to the stock in the new company which was in equity the property of the complainants when issued.

Appeal from Washtenaw; Kinne, J. Submitted October 22, 1915. (Docket No. 75.) Decided March 30, 1916. Rehearing denied April 21, 1916.

Bill by Homer C. Millen and another against Nathan S. Potter and another for an accounting, and asking that defendant be decreed to issue certain stock to complainants, and for other relief. From a decree for complainants, defendants appeal. Affirmed.

*A. J. Sawyer* (*A. F. Freeman,* of counsel), for complainants.

*Potter & De Land* (*Wilson & Cobb,* of counsel), for defendants.

PERSON, J. This suit was brought to enforce the assignment and delivery by defendant Potter to com-

plainants of certain stock in the defendant corporation and for the performance of certain other features of an alleged agreement between defendant Potter and Homer C. Millen, one of the complainants.

The Millen Portland Cement Company became an involuntary bankrupt in August, 1909. In October of the same year the Union Bank of Jackson began the foreclosure of a mortgage which covered all the property of the company. On the 1st day of June, 1910, the property was sold under the foreclosure and bid in for the bank by one of its directors. Defendant Potter had before this taken some interest in the affairs of the company, and on the 9th day of July, 1910, he secured from the bank an option for the purchase of all its rights and interest in the property accruing from the foreclosure. In September, 1910, he acted upon his rights under the option, and the agreement for the sale and purchase of the property became binding upon both parties. In the meantime he had obtained a deed of all the company's lands and other assets from the trustee in bankruptcy, and had made arrangements with those creditors of the company who held liens upon its property for the payment of their claims at a greatly reduced figure. Later, and in 1911, he organized the Michigan Portland Cement Company, the other defendant, with authorized capital stock to the amount of $500,000, divided into 5,000 shares of the par value of $100 each. Of this authorized capital $400,000 is in the form of common stock, and $100,000 is preferred stock. According to the articles of association all of the stock had been subscribed, and $50,000 had been paid in on the common stock, and $100,000 on the preferred stock, all in cash. The incorporators were the defendant Nathan S. Potter, his sons, Nathan S. Potter, Jr., Kennedy L. Potter, Clark Zeph Potter, and his daughter, Harriet L. P. Stewart. Of these Nathan S. Potter subscribed for and yet holds 3,500

shares of the common stock and 500 shares of the preferred stock, while Nathan S. Potter, Jr., Kennedy L. Potter, Clark Zeph Potter, and Harriet L. P. Stewart each subscribed for and holds 125 shares of the common stock and 125 shares of the preferred stock. On the 3d day of November, 1914, defendant Potter conveyed to this new company by warranty deed all of the lands and property received by him through the deed from the trustee in bankruptcy as belonging to the old Millen Portland Cement Company. In and by this deed he especially warranted the property to be free and clear from all rights and claims of the Union Bank of Jackson. And either through defendant Potter personally or through the new company considerable improvements have been made to the cement plant.

The Millen Portland Cement Company, when it went into bankruptcy, owned some 683 acres of land containing beds of marl and other material for the production of cement; and upon this land was a plant with machinery for its manufacture. The company had also a small amount of personal property. The value of all such property must be somewhat problematical, but Mr. Millen testifies that it was worth from $400,000 to $500,000, and his testimony does not seem to be directly disputed in the record. The liens and incumbrances thereon amounted to about $130,000, and the unsecured indebtedness of the old company seems to have been small. The complainants, who are husband and wife, owned a majority of the stock of the old company—that is, of the Millen Portland Cement Company. And, whatever the value of the property may really have been, the old company and the complainants, as owners of a majority of its stock, seem to have had an equity therein of considerable value. Such being the situation, it is the claim of complainants in this suit that in his activities above described Mr. Potter was but carrying out, in part, the terms of an agree-

ment which he had entered into with Mr. Millen, one of the complainants, whereby the new company was to be formed to take over the property of the old company, and the stock of the new company divided in certain proportions between them. As it is the purpose of this suit to obtain such division of the stock and the performance of certain other provisions of the alleged agreement, to be hereinafter mentioned, the important questions to be first determined are whether the complainants are right in claiming that such an agreement was made between the parties, and its terms if it was made. The defendants deny that any such agreement ever existed, and insist that complainants have no interest whatever in the new company, or in its stock.

Inasmuch as the agreement was oral, if there was one, and resulted from many conferences and interviews between Mr. Millen and Mr. Potter, about which there is much dispute, it would be almost impossible from their testimony alone to come to any satisfactory conclusion as to the result of those conferences and interviews. But there are certain documents and letters which throw much light upon the questions to be determined. It is claimed by complainant that on the 23d day of May, 1910, just before the sale of the property of the Millen Portland Cement Company in the foreclosure proceedings by the Union Bank, Mr. Millen was in the office of defendant Potter, in the city of Jackson, urging him to put their agreement in writing. It is Mr. Millen's testimony that Potter at this time picked up a large envelope in which mail had evidently been received, and upon the back of it made a memorandum of the principal points in their agreement. Mr. Millen says that he took the envelope home that evening for the purpose of showing it to his wife, and that she, in the presence of a Mr. Coe and himself, copied the memorandum upon a typewriter, changing it only

enough to put it in the form of a contract. Mr. Millen, Mrs. Millen, and Mr. Coe all testify that they read the memorandum on the back of the envelope, that it was in the handwriting of Mr. Potter, that it was compared by them all with the copy made by Mrs. Millen, and that the copy was absolutely correct, except as to such changes only as were necessary to put it in contract form. The envelope, they say, was then thrown away, and Mr. Millen says that he took the copy to Jackson the next morning for the purpose of having it signed. He testifies that, when he showed it to Mr. Potter, the latter said it was correct, but declined to sign it until after the foreclosure sale should have taken place. This memorandum is referred to in the record as Exhibit E, and will be so referred to here. It was never signed, but was produced in evidence, and reads as follows:

"CHELSEA, MICH., May 23, 1910.

"N. S. Potter, of Jackson, Mich., party of the first part, hereby agrees with Homer C. Millen, party of the second part, that he will before the 1st day of June, 1910, reorganize the Millen Portland Cement Company for the purpose of taking over the property of the present company, and that if matters are not satisfactorily arranged before that date that he will buy it. Such company to be reorganized with a capital stock of four hundred thousand common stock, one hundred thousand of preferred stock, and a bond issue of one hundred thousand dollars (100) ; one hundred thousand of the common stock to go with bonds, one hundred thousand common stock to remain in the treasury of the company to be given as necessary with the preferred stock, the remaining two hundred thousand common stock to be equally divided between N. S. Potter, N. Potter, and H. C. Millen; N. Potter to have the management of the plant, and H. C. Millen to have entire charge of the sales department, with an office in the village of Chelsea, both named parties to draw a salary of $3,000 for the first year."

Mr. Potter admits having made some figures upon

the back of an envelope, but he says that they were not of the character contained in the alleged copy, and that they were not intended to be minutes of any agreement. Its purpose being in dispute, this paper, standing alone, would not very greatly assist us, but, in connection with other writings, it becomes important.

It seems that Bernard B. Selling, as trustee, held a mortgage for $5,000 upon the property of the Millen Portland Cement Company which necessarily had to be taken care of in reorganizing the business and transferring the property to the new company. Mr. Selling had also an unsecured claim against the old company, and on the 14th day of July, 1910, he, as party of the first part, and defendant Potter, as party of the second part, entered into a written agreement by the terms of which Potter was given an option to purchase these claims within a certain time and at a certain price. But the important part of this agreement, so far as this case is concerned, consisted of certain provisions for securing payment to Mr. Selling, and to a firm by the name of Lehman & Riggs, of certain indebtedness, by means of stock which would come to Mr. Millen when the new company should be organized. This contract bears Mr. Potter's own signature and cannot be questioned. It reads in part as follows:

"It is further provided that the option hereinbefore described as given by said first party to said second party is conditional upon the signing by Homer C. Millen and May Millen of an order on the said second party in favor of the said first party for his benefit and the benefit of Lehman & Riggs, a true copy of which order is hereto annexed and marked Exhibit A, the signature to which said contract or order shall be affixed by said Homer C. Millen and May Millen and said second party to this agreement at the time of or before the acceptance of said option, and such contract or order shall thereupon be delivered to said first party."

And the Exhibit A referred to in and attached to
the contract reads in this way:

"Agreement made this ———— day of ————, A. D.
1910, by and between Nathan S. Potter, of Jackson,
Michigan, hereinafter referred to as party of the first
part, Bernard B. Selling, of Detroit, Michigan, herein-
after referred to as party of the second part, and
Homer C. Millen and May Millen of Chelsea, Michigan,
hereinafter referred to as parties of the third part,
witnesseth:

"Whereas, the said first party has undertaken the
reorganization of the Millen Portland Cement Com-
pany, in which said company the said second party has
an interest, and an agreement has on July 14, 1910,
been made between the said first and second parties,
whereby an option has been given to the said first
party upon the interest of the said second party in the
said Millen Portland Cement Company and any claims
against it; and

"Whereas, the said second party has a claim for
three thousand dollars and accrued interest against the
said third parties, represented by promissory notes
bearing date July 23, 1908; and

"Whereas, Lehman & Riggs, of the city of Detroit,
Michigan, have a claim also against the said third
parties in an amount in excess of $3,000 with accrued
interest, represented by promissory notes; and

"Whereas, in the reorganization of said Millen Port-
land Cement Company and in the formation of the said
new company the said third parties have a tentative
agreement with first party whereby said third parties
may receive an amount in common stock to the amount
of $20,000 or more, par value:

"It is hereby agreed that, if the said first party
avails himself of the option given by said second party
in the instrument bearing date herewith and herein-
before described, then and in such case there shall be
issued out of the stock (if any) which may be coming
to the said third parties, or either of them, upon such
reorganization, in said new company, two (2) certifi-
cates of stock of the par value of $10,000 each of com-
mon stock, one of which certificates of $10,000 is to be
held as collateral by the said second party on his

claim against the said third parties upon the promissory notes hereinbefore referred to, and the other certificate of $10,000 is to be held by the said second party, as trustee for said Lehman & Riggs, attorneys, for the payment of the notes held by said Lehman & Riggs against said third parties, such collateral to be held by the said second party for three (3) years, and the said third parties are to have the right to redeem such collateral by the payment of said promissory notes to the said second party and to the said Lehman & Riggs, with the interest due thereon, at any time within said three years.

"And the said first party hereby agrees that in case he avails himself of the option hereinbefore referred to given to him on July 14, 1910, by written contract between himself and the said second party, he will, out of any stock which may be coming to either or both of the third parties hereto, directly or indirectly, cause to be placed in the hands of said second party valid certificates of common stock in such reorganized company in the sum of $20,000 for the purposes hereinbefore described, if such amount be coming to either or both of said third parties, and said third parties hereby instruct said first party so to do.

"Witness the hands and seals of the parties to this agreement the day and year first above written."

It seems that Exhibit A was not signed by complainants because of an objection which they had to the provision in favor of Lehman & Riggs, and that its place was taken by the following order and acceptance which were also given in evidence, to wit:

"JACKSON, MICH., August 6, 1910.
"To MR. N. S. POTTER,
"Jackson, Mich.
*"Dear Sir:*

"Whereas, it is contemplated by you to reorganize the Millen Portland Cement Company and to form a new corporation to take over the same, you are, for a valuable consideration, hereby instructed and ordered to turn over to Bernard B. Selling, of the city of Detroit, Wayne county, Michigan, common stock of the par value of $10,000 of said new company as soon as

issued, to be held as security for the prompt payment at maturity of a promissory note bearing date August 1, 1910, in the sum of $3,000.00, to the order of Bernard B. Selling, payable three years from date, with interest at the rate of five (5) per cent. per annum, payable semi-annually. There shall be no right to foreclose said pledge until August 1, 1913.

[Signed] "HOMER C. MILLEN. [L. S.]

"For and in consideration of one dollar and other valuable considerations, I, the undersigned, do hereby accept the above order, the said stock to be delivered to the said Bernard B. Selling out of any stock that may hereafter be coming to the said Homer C. Millen in said new corporation to be formed when such corporation is formed. [Signed]        N. S. POTTER.

"Dated Jackson, Michigan, August 8, A. D. 1910."

The following letter was also produced at the hearing, written at a still later date, by Mr. H. S. Holmes, a banker at Chelsea, to defendant Potter:

"CHELSEA, MICHIGAN, Jan. 2, 1912.

"MR. N. S. POTTER,
    "Jackson, Mich.
"*Dear Sir:*

"If you can arrange with Mr. Millen so as $25,000 of par value of Mich. Portland cement stock can be issued to me when time comes and to be assigned to the Millens on payment to me of $1,883.00 dollars with interest at 6%, I am inclined to assist him at this time. He says you are inclined to guarantee no loss on acct. of your faith in the stock of Michigan Portland. If so I would feel I would be all right some time. Wishing you the compliments of the season, etc,

"I am yours, etc.,        H. S. HOLMES."

And upon the back of this letter is the following indorsement by Mr. Potter, and in his handwriting:

"I will reserve $25,000 par value common stock as collateral for you conditioned that when stock is delivered to you, you pay such advances as I have made represented by Millen's note dated Dec. 22, 1911, $759.45 with int. 6% or any renewals of said note.

"Jan. 2, 1912.        N. S. POTTER."

It is true that none of these writings contain a direct agreement between Mr. Potter and Mr. Millen, but they are consistent only with the existence of such an agreement. In Exhibit A, attached to the Selling contract of July 14, 1910, is the affirmative statement that a tentative agreement existed between Potter and the Millens, whereby the latter might receive common stock in the new company to the amount of $20,000 or more. This is directly contradictory to Mr. Potter's testimony that there never was any agreement between the parties as to stock in the new company. It is apparent that this agreement was "tentative" in the sense only that the property might never be acquired or the new company formed. The amount of the stock is given at $20,000 or more, because that was the amount called for by the Selling contract and all that Selling was interested in. The indorsement upon the Holmes letter whereby Potter was to reserve $25,000 of the stock going to the Millens, as security for the indebtedness to Holmes, was made long after the new company had been actually organized. Mr. Potter's explanation that he was only intending a donation of stock to the Millens does not seem to accord with the situation. We are constrained to believe, and to find, from the foregoing evidence, that there was an agreement between Mr. Millen and Mr. Potter relative to the organization of the new company and the distribution of its stock, and that the memorandum written by Potter on the envelope and copied by Mrs. Millen into Exhibit E was intended to state and did state certain material terms of that agreement. This being true, it is clear that Mr. Millen was to receive one-third of $200,000 par value of the stock of the new company upon its organization, or, in other words, 666 2/3 shares of the stock.

It is not claimed that the memorandum Exhibit E contains all the details of the agreement between the

parties. Mr. Millen testifies, in substance, that he was to assist in securing a discount of the claims against the old company; that he was to prevail upon the creditors of the old company, as far as possible, not to redeem from any sale that might take place; that he was not himself to take any steps towards redemption, and that he was to assist, so far as he could, in obtaining transfers of the property to the new company. His statement as to the part he was to perform under the agreement is undoubtedly correct; for it is consistent with the memorandum made by Potter, and the evidence shows that he was active in the matter throughout. He insists that he fully performed his part of the agreement, and, although Mr. Potter denies the alleged effectiveness of some of his work, yet Mr. Potter's defense is, not that Millen failed to perform his part, but that there was not any agreement. In finding that there was an agreement, it is impossible, under the circumstances, to avoid finding that Millen performed his part of it. This being true, why should he not have such relief as can properly be given him?

It is probably true that a court of equity would refuse to attempt the enforcement of such a contract as was entered into by Mr. Millen and Mr. Potter if the contract had not already been largely performed by the parties. But this suit was not brought to obtain the specific performance of the contract as a whole. The new corporation has been organized, the liens and incumbrances upon the property have been satisfied and removed, and the property has been transferred to the new company. The warranty deed from Mr. Potter must operate, not only as a transfer of such title as he received from the trustee in bankruptcy, but also as a transfer of his interest in the contract with the bank. The terms of the contract, so far as it has been performed, are made certain by the performance. That portion which is to be performed is made definite by

the memorandum. There seems to be no good reason why a court of equity should not decree that Mr. Millen's share of the stock should be turned over to the complainants; for Mrs. Millen, it seems, has acquired an interest in the agreement, and in the stock, by virtue of various contracts with her husband. This was the view taken of the matter by the circuit judge, and we think it is a correct view.

But it is urged on behalf of defendant Potter that certain terms of the contract as set out in the memorandum are illegal as against public policy, and that their illegality so affects the entire contract that no portion of it can be enforced. Reference is had in this behalf to the provisions that N. Potter should have the management of the plant and Mr. Millen the entire charge of the sales department. On the other hand, counsel for complainants insist that these provisions are legal and should be enforced. We agree with counsel for defendant that such provisions may be against public policy under some circumstances. But it is not necessary to inquire whether they would be in this instance, because they are too indefinite to have any real meaning. No period of time is mentioned during which either young Mr. Potter should have the management of the plant or complainant Millen have control of the sales department. Their continuance in office seems left entirely to the judgment of the board of directors. In saying that complainant Millen's salary should be $3,000 for the first year, we understand the agreement to mean that his salary should be at that rate for the first year if he remained in office. A contract will not be so construed as to make it illegal if such construction can be reasonably avoided. Thus considered these provisions do not prevent a decree requiring their portion of the stock to be turned over to complainants.

190 Mich.—18.

The contract, it is true, was oral, but the statute of frauds is not involved. Complainants are not seeking to enforce a sale of stock from defendant Potter to themselves; for the stock rightfully belonged to them when it was issued. Nor is there any attempt to enforce a conveyance of land from defendant Potter to the new corporation, inasmuch as he has already made such conveyance by deed with full covenants of warranty which carries with it all his rights under the contract with the bank. It appears, however, that a portion of the purchase price named in the contract has not yet been paid. The trustee who holds title for the bank testified that he was ready to make conveyance according to the terms of the contract whenever this balance of the purchase price should be paid. The circuit judge was right in incorporating in the decree a provision directing that defendant Potter complete this payment.

In the organization of the new company it is clear that defendant Potter departed somewhat from the agreement as set forth in Exhibit E. He himself, with others, subscribed for all of the stock, instead of issuing bonds and disposing of a portion of the common stock with such bonds, and a portion with the preferred stock. The complainants have assented to these changes by demanding their proportion of the common stock in the company as organized, and by doing so some questions discussed in the briefs of counsel are rendered unimportant.

Upon the whole record the decree made by the circuit judge seems just and equitable, and it will be affirmed, with costs to the complainants.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.